IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| E. LYNN HANSEN, as Personal Representative on behalf of the heirs of SHAWN EMERY, et al.,<br><br>                    Plaintiffs,<br>v.<br><br>CHEVRON USA, INC., et al.,<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT SOLI-BOND, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:08-cv-959 DN<br><br>District Judge David Nuffer |

      This is a personal injury case brought by two employees (Plaintiffs Shawn Emery[1] and Keegan Westphal) against their employer (Defendant Soli-Bond, Inc.) and the owner and operator of the oil refinery where Plaintiffs were injured (Defendant Chevron USA, Inc.). Plaintiffs have asserted claims for negligence, intentional misconduct, negligent infliction of emotional distress, and wrongful death arising out of their alleged exposure to toxic gases while working for Soli-Bond at Chevron's Salt Lake Refinery.

      Soli-Bond's Motion for Summary Judgment (docket no. 65) and Motion to Strike the Deposition of Troy Graf (docket no. 75) are resolved by this order. Soli-Bond seeks summary judgment on the ground that Plaintiffs' claims are barred by the exclusive remedy provision of Utah's Workers' Compensation Act (the Act), which "relieves employers of any common law liability for injuries sustained by an employee 'on account of any accident or injury or death' that is 'contracted, sustained, aggravated, or incurred by the employee in the course of or because of

---

[1] Mr. Emery died approximately three months after this case was filed. E. Lynn Hansen, the personal representative of Emery's heirs, was substituted as a Plaintiff in Emery's place.

or arising out of the employee's employment.'"[2] There is no dispute in this case that Plaintiffs' alleged injuries were sustained in the course of their employment. However, Plaintiffs argue their claims qualify for the "intentional injury exception," which allows an employee to maintain a common law action for injuries intentionally caused by the employer notwithstanding the exclusive remedy provision of the Act.[3]

The memoranda and evidentiary materials submitted by the parties have been carefully reviewed. Oral argument was heard on April 26, 2012. Because Plaintiffs' claims against Soli-Bond do not qualify for the intentional injury exception and are therefore barred by the Act, Soli-Bond's Motion for Summary Judgment is GRANTED and the Motion to Strike the Deposition of Troy Graf is DENIED as moot.

## UNDISPUTED FACTS

By contract, Soli-Bond performed certain filtering services for Chevron at Chevron's Salt Lake Refinery (the Refinery) from approximately June 2004 to March 22, 2008. These filtering services involved separating solid calcium fluoride particles from regenerated liquid potassium hydroxide (a chemical used to neutralize acids that result from the process of refining crude oil) using a mechanical filter press that pumped the combined material through a filter membrane. This case arises from Plaintiffs' claimed exposure to toxic gases while performing filtering services on behalf of Soli-Bond at Chevron's Refinery.

The following facts are undisputed by Plaintiffs and Soli-Bond for purposes of Soli-Bond's Motion for Summary Judgment. In June 2004, Chevron entered into a contract with Soli-Bond to have Soli-Bond separate regenerated liquid potassium hydroxide from solid

---

[2] *Helf v. Chevron U.S.A., Inc.*, 203 P.3d 962, 967 (Utah 2009) (quoting Utah Code Ann. § 34A-2-105(1)).
[3] *Id.* at 968.

calcium fluoride particles.[4] Soli-Bond used a plate and frame filter press to separate the solid particles from the liquid.[5] The filtering process was solely mechanical in nature and did not involve the introduction of any new chemicals to the materials being filtered.[6]

Plaintiffs have not alleged that exposure to either calcium fluoride or potassium hydroxide was harmful or caused the injuries they allege to have suffered. They also do not allege that the respiratory equipment provided for their use was insufficient to protect against exposure to either calcium fluoride or potassium hydroxide. Plaintiffs instead allege they were somehow exposed to hydrogen sulfide, dimethyl sulfide, ethyl methyl sulfide, isobutyl mercaptan, n-butyl mercaptan, 3-methyl thiophene, dimethyl sulfide, thiophene, carbonyl sulfide, and carbon disulfide.[7] Hydrogen sulfide ("H2S") is a highly toxic and flammable gas that is commonplace and inherent in refinery operations.[8]

H2S may be fatal if inhaled. At moderate levels of exposure, inhalation can cause headache, dizziness, nausea and vomiting, coughing, and difficulty breathing. Accordingly, if exposure is possible, a positive pressure air-supplying respirator must be worn.[9]

Beginning in December 2007, Chevron required that all workers, including Soli-Bond's employees, wear personal H2S monitors throughout the Refinery.[10] At some point after

---

[4] Emery Plas.' Mem. in Opp'n to Soli-Bond's Mot. for Summ. J. (Mem. in Opp'n) at ii, ¶ 1, docket no. 67, filed January 31, 2012.

[5] Dep. of Keegan Westphal 22:22-23:24, docket no. 66-3, filed January 3, 2012.

[6] *Id.* at 23:23-24.

[7] Second Am. Compl. and Jury Demand, ¶ 19, docket no. 36, filed February 9, 2011.

[8] Mem. in Opp'n at xxii, ¶ 8.

[9] *Id.* at xxii, ¶ 9.

[10] *Id.* at xxii, ¶ 10.

December 6, 2007, Soli-Bond purchased and issued personal H2S monitors to Plaintiffs Emery and Westphal.[11]

After beginning to wear H2S monitors, Plaintiffs began experiencing incidents where their personal H2S monitors would alarm, indicating the presence of H2S.[12] Specifically, Plaintiff Westphal recounted at least four instances where his monitor had gone into alarm mode, although he could not recall the dates of these instances.[13] However, Westphal also testified that on most days at work his monitor did not go into alarm mode.[14] Westphal further testified that nothing had changed with respect to Soli-Bond's operations to cause these incidents; that the alarms were temporary; and that he could return to his work the same day without any problems.[15] None of these incidents were documented in Soli-Bond's turnover log that was kept in the filtering trailer.[16] Plaintiffs told Soli-Bond's manager, Paul Kiswardy, that the H2S monitors he provided them had been alarming, and Plaintiffs were assured that there could not possibly be H2S in that area.[17] In February 2008, H2S was unexpectedly found throughout the Chevron Refinery in different areas, including the area were the filtering operation was conducted.[18]

In early February 2008, Plaintiff Westphal was suffering from ongoing cold and flu-like symptoms, which he came to believe were caused by chemical exposure at work. After going to

---

[11] *Id.* at xxii, ¶ 11.

[12] *Id.* at xxii, ¶ 12.

[13] Dep. of Keegan Westphal 85:11-88:21, 89:23-90:18, 92:17-93:22, 103:15-104:9, docket no. 66-3, filed January 3, 2012.

[14] Mem. in Opp'n at x, ¶ 24.

[15] *Id.* at x, ¶ 23.

[16] *Id.* at xi, ¶ 26.

[17] *Id.* at xxiii, ¶ 14.

[18] *Id.* at xxiii, ¶ 13.

his doctor, he was told to stay home from work, and Kiswardy was notified of these facts.[19] On February 22, 2008, Plaintiff Emery became ill and went to his doctor. Emery and his doctor discussed concerns that chemical exposure at work was likely causing bronchitis type symptoms. His doctor wrote him work releases to give to his employer, which excused him from work through March 12, 2008.[20] Emery notified Kiswardy and Westphal of his medical situation and his medically-related work absences.[21]

On or about February 25, 2008, Westphal asked Chevron operators if he could speak with them regarding safety concerns.[22] Chevron employee Mark Rasmussen arranged for the meeting to take place the following day so that other Chevron personnel (the Safety Coordinator, Chris Crossman, and the Alky Operator, Von Holgreen) could also be present. Westphal phoned Paul Kiswardy to tell him about the meeting and left him a voicemail asking if he could participate by phone. Chevron also attempted to call Kiswardy at the time of the meeting.[23] The meeting was held on February 26, 2008, without Kiswardy.[24] Based on the concerns expressed by Westphal during this meeting, Rasmussen decided that supplied or live air suits should be worn by Soli-Bond operators while working around the filter press.[25] Rasmussen and Crossman each independently called Kiswardy regarding the discussions and the decisions made as a result of the February 26, 2008 safety meeting, and Kiswardy said that he would set up a round of air

---

[19] *Id.* at xxiii, ¶ 15.

[20] *Id.* at xxiii, ¶ 16.

[21] *Id.* at xxiii, ¶ 17.

[22] *Id.* at xxiv, ¶ 18.

[23] *Id.* at xxiv, ¶¶ 19-21.

[24] *Id.* at xxiv, ¶ 22.

[25] Dep. of Mark Rasmussen 86:2-23, 175:20-176:8, docket no. 67-1 at ex. 2, filed January 31, 2012; Dep. of Keegan Westphal 112:17-22, docket no. 67-1 at ex. 6, filed January 31, 2012; Notes from Discussion Requested by Keegan Westphal from Solibond, docket no. 67-1 at ex. 7, filed January 31, 2012.

sampling similar to a set previously done in 2006.[26] Soli-Bond terminated Westphal's employment on February 27, 2008, the day after the safety meeting.[27]

Two further rounds of filtering took place on March 5-9, 2008 and on March 19-22, 2008. Notwithstanding Chevron's directive, the use of supplied air suits was not implemented by Soli-Bond during either of these filtering operations.[28] On March 5, 2008, Soli-Bond started a filtering operation using employees Ken McLean, Troy Graff, and Hal Smith. This filtering operation lasted until March 9 when the batch was completed.[29] H2S monitors were alarming during the March 5-9 filter campaign, and Soli-Bond employees Ken McLean, Hal Smith, and Troy Graf were aware of such alarms.[30] However, there is no evidence in the record indicating that Soli-Bond's management was informed of such alarms. Likewise, there is no evidence that any of Soli-Bond's employees sustained or reported any injuries during the March 5-9, 2008 filtering operation.

On March 18, 2008, Kiswardy held a meeting with the Soli-Bond filtering operators at a hotel in Salt Lake City. In that meeting, Kiswardy told the operators that "absenteeism is not going to be tolerated, because we have work to do," but did not raise the issue of supplied air, Keegan Westphal's illness, the concern of H2S in the area of the filtering operations, the safety-meeting held with Chevron in late February, or the safety measures that Chevron requested Soli-Bond implement.[31]

---

[26] Mem. in Opp'n at xxiv, ¶¶ 23-25.

[27] Employment File of Keegan Westphal, docket no. 67-1 at ex. 19.

[28] Dep. of Paul Kiswardy 156:7-12, docket no. 67-1 at ex. 1, filed January 31, 2012.

[29] Mem. in Opp'n at xiv, ¶ 32.

[30] Dep. of Troy Graf 36:5-22, 37:12-18, docket no. 67-1 at ex. 10, filed on January 31, 2012.

[31] Mem. in Opp at xxv, ¶¶ 27, 29.

The next day, March 19, 2008, Soli-Bond started a new filtering campaign, which continued on March 20-22.[32] Emery returned to work that same day as a Soli-Bond filter press operator.[33] H2S monitors alarmed every day during the March 19-22 filtering campaign, and Soli-Bond employees Graf and Emery, as well as Chevron personnel, were aware of the alarms.[34] H2S was found through "the whole refinery."[35] However, during the first three days of this filtering campaign no Soli-Bond operator complained to Soli-Bond about concerns regarding the operation or that they suffered any physical ailments connected to the filtering.[36]

On March 22, 2008, while working in the Soli-Bond filter processing trailer, Emery's H2S monitor alarmed that a high level of H2S was present. No one at Chevron documented Emery's 466 ppm reading. However, after notifying Chevron personnel of the emergency, a Chevron employee indicated his TMX monitor read H2S at 300 ppm.[37] While still at the refinery on March 22, 2008, Emery reported the H2S alarms to Kiswardy by telephone. Emery also reported his physical symptoms, including feeling shaky and unsteady, and vomited while talking to Kiswardy on the phone.[38] Over the next few days, as Emery became sicker, Kiswardy refused to get him medical attention — other than to have Emery seen at the Rocky Mountain Care Clinic for drug testing and to see if he was faking his symptoms — until Chris Crossman at Chevron advised Kiswardy to authorize medical treatment.[39] Chevron investigated the March 22, 2008 incident, but was unable to determine what set off the H2S monitor or how a toxic gas

---

[32] *Id.* at xvi, ¶ 35.

[33] *Id.* at xxv, ¶ 28.

[34] Dep. of Troy Graf 42:4-20, docket no. 67-1 at ex. 10.

[35] *Id.*

[36] Dep. of Paul Kiswardy 417:22-418:14, docket no. 66-1, filed January 3, 2012.

[37] Mem. in Opp'n at xxv, ¶ 30.

[38] *Id.* at xxvi, ¶ 31.

[39] *Id.* at xxvi, ¶ 32.

could have been present in or near Soli-Bond's filter press or its trailer.[40] Emery died on February 15, 2009 as a result of injuries from exposure to environmental toxins.[41]

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[42] In applying this standard, the Court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[43] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[44] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[45]

## DISCUSSION

To demonstrate intent to injure, and thereby qualify for the intentional injury exception to the Utah Worker's Compensation Act's bar on common law claims, Plaintiffs Emery and Westphal must prove that Soli-Bond had "a specific mental state in which [it] knew or expected that injury would be the consequence of [its] action."[46] The Supreme Court of Utah recently provided comprehensive guidance concerning the scope of the intentional injury exception in the case of *Helf v. Chevron*.[47] Remarkably, the *Helf* case also involves employee exposure to toxic

---

[40] Mem. in Opp'n at xx, ¶ 44.

[41] *Id.* at xxvi, ¶ 33.

[42] Fed. R. Civ. P. 56(a).

[43] *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011) (internal quotations omitted).

[44] *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008).

[45] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[46] *Helf*, 203 P.3d at 974.

[47] 203 P.3d 962 (Utah 2009).

gases at Chevron's Salt Lake Refinery. In *Helf,* Chevron had devised a new cost-saving method for disposing of "spent toxic sludge" — an "ultrahazardous substance" that had to be neutralized before it could be safely disposed of.[48] The neutralization process required adding "highly reactive acids" that caused "intense and violent reactions" and created "ultrahazardous vapors known to cause serious and permanent injury to humans who breathe them."[49] This process had previously been done off-site under controlled conditions.[50]

However, in an attempt to cut costs, Chevron officials decided to attempt the neutralization process in an open-air pit on the grounds of the Refinery.[51] The first attempt, which took place during the day shift, resulted in the release of a "noxious purple cloud containing concentrated hydrogen sulfide, mercaptan gases, and other toxic chemical compounds" that drifted across the Refinery, "setting off alarms and causing several Chevron employees . . . to fall ill and be sent home."[52] Without taking any further safety measures, Chevron decided to resume the neutralization process later that night, after a shift change.[53]

During the night shift, the plaintiff employee was directed to carry out the neutralization process at the open-air pit, but she was not told about the earlier chemical reaction, the resulting hazardous conditions, or the employees who became ill from exposure to the noxious purple gas.[54] Nor was she told that she would need respiratory protection to do the job.[55] The plaintiff carried out the job as instructed, became sick when she inhaled the purple gas, vomited and

---

[48] *Id.* at 965.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 966.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

passed out, and suffered significant permanent injuries.[56] When she sued Chevron to recover for her injuries, her claims were dismissed by the district court under the exclusive remedy provision of the Act.

The Utah Supreme Court reversed the district court, holding the plaintiff had pleaded facts upon which a reasonable jury could conclude that her injuries were intentionally caused by Chevron and, therefore, were not subject to the exclusive remedy provision of the Act.[57] In so doing, the court clarified that "the 'intent to injure' analysis focuses on whether the actor knew or expected that the injury would occur as a consequence of his actions."[58] The standard thus distinguishes between "intentional acts resulting in unknown or unexpected injuries, which are covered under the Act by workers' compensation, and intentional acts resulting in known or expected injuries, which fall within the intentional injury exception."[59] Accordingly, intent to injure is established when the employer "knew or expected" that its actions would result in injury to the employee, "even if [its] motive for acting was not to injure [the employee]."[60] However, intent to injure may not be imputed merely because of a high probability of injury.[61] "[A] plaintiff may not demonstrate intent by showing merely that some injury was substantially certain to occur at some time."[62] Rather, the plaintiff must prove "a specific mental state in which the actor knew or expected that injury would be the consequence of his action."[63] Applying this standard, the court concluded that the plaintiff had alleged facts that could support

---

[56] *Id.*

[57] *Id.* at 974-75.

[58] *Id.* at 970.

[59] *Id.*

[60] *Id.* at 972-73.

[61] *Id.* at 973.

[62] *Id.* at 974.

[63] *Id.*

"the conclusion that her injury was intentional, rather than accidental, because her supervisors knew or expected that re-initiating the neutralization process would result in her injury.[64]

The *Help* case is instructively contrasted with the case of *Lantz v. National Semiconductor Corp.*[65] In that case, a chemical spill occurred at a computer chip fabrication plant.[66] The plaintiff employee twice approached his supervisor, complained of illness, and asked for permission to evacuate, but was told the "smell was not that bad."[67] After the second request to evacuate was denied, the plaintiff became ill and fell unconscious.[68] Although the plaintiff was aware of the employers' policy of allowing employees to evacuate whenever they felt unsafe, the plaintiff testified that he feared reprisal from his supervisor.[69] The plaintiff brought claims against both the supervisor and the employer, which the district court concluded on summary judgment were barred by the exclusive remedy provision of the Act.[70] The Utah Court of Appeals affirmed, holding the plaintiff had failed to submit evidence showing that the supervisor "had an actual deliberate intent to injure him" — a result approved of by the *Help* court.[71]

Under these cases, the claims of Plaintiffs Emery and Westphal fall outside the scope of the intentional injury exception and are therefore barred by the exclusive remedy provision of the Utah Act. As outlined below, neither of the Plaintiffs have submitted evidence upon which a reasonable jury could conclude that Soli-Bond intentionally injured him.

---

[64] *Id.* at 974-75.

[65] 775 P.2d 937 (Utah Ct. App. 1989).

[66] *Lantz v. National Semiconductor Corp.*, 775 P.2d 937 (Utah Ct. App. 1989).

[67] *Id.* at 938.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 938.

[71] *Id.* at 940; *Help*, 203 P.3d at 971 ("Under the 'intent to injure' standard, the supervisor would only be liable if he knew or expected that injury would result from his failure to evacuate and he intentionally chose not to evacuate.")

Westphal has not submitted any opposition to Soli-Bond's Motion for Summary Judgment, and the Court is unaware of any evidence in the record demonstrating that Soli-Bond knew or expected Westphal would be exposed to toxic gases on any specific occasion while he filtered materials presumed to be comprised solely of calcium fluoride and potassium hydroxide. Westphal did notify Soli-Bond of at least four occasions over a period of approximately three months when his personal H2S monitor alarmed. However, there is no evidence that Soli-Bond knew or expected in advance of any of those occasions that Westphal would be exposed to H2S. To the contrary, Westphal admitted that on most days his H2S monitor did not alarm and that he cannot recall any specific day on which he felt that he had been exposed to any toxic gases. Accordingly, Westphal has failed to submit evidence of intent to injure sufficient to withstand Soli-Bond's Motion for Summary Judgment.

Emery likewise cannot prove that Soli-Bond had "a specific mental state in which [it] knew or expected that injury" would result to Emery when he carried out the filtering operations at Chevron's Refinery on March 22, 2008.[72] Emery's alleged injuries were not caused by the non-toxic chemicals presumed to be involved in the filtering process (calcium fluoride and potassium hydroxide), but by other chemicals (H2S and other toxic gases) from an unknown source. Even Chevron's post-incident investigation was unable to determine how toxic gas could have been present in or near Soli-Bond's filtering operation. In this regard, Emery's case is fundamentally different from *Help*, where the employer knew that adding acid to the toxic sludge in an open-air pit would result in the immediate release of toxic gases, injuring persons exposed to the gases, because that happened when it was attempted on the earlier shift.[73]

---

[72] *Help*, 203 P.3d at 974.

[73] *Id.* at 974-75. Emery's case is likewise distinguished from the "indisputably intentional . . . acts" that justified application of the intentional injury exception in *Bryan v. Utah Int'l*, 533 P.2d 892 (Utah 1975) (intentional battery), and *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055 (Utah 1991) (defamation). *Help*, 203 P.3d at 971.

12

Nonetheless, Emery attempts to show "intent to injure" by pointing out that

- before Emery's exposure on March 22, 2008, Soli-Bond was aware that Westphal and Emery had experienced physical illness the previous month;
- H2S monitors had alarmed at the filtering site; and
- Chevron had directed Soli-Bond employees to wear supplied-air suits while performing filtering services.

However, there is no evidence that Soli-Bond understood the illness experienced by Westphal and Emery in February 2008 was caused by, or in any way related to, toxic gases near the filtering operation. In contrast to the same-day situation in *Help*, the evidence in this case is that Soli-Bond knew of four separate instances of H2S alarms in the area of the filtering operation over a period of three months. More importantly, there is no evidence that Soli-Bond was aware of any H2S alarms during either of the March filtering operations prior to Emery's exposure on March 22. As far as Soli-Bond knew, the March 5-9 filtering operation and the March 19-21 filtering operation (until Emery's exposure) were accomplished without incident. This explains why Soli-Bond did not raise concerns about H2S during the March 18 meeting with Emery and the other filter operators. Moreover, if Emery did not view the H2S alarms occurring daily at the filtering operation on March 19-21 as worthy of reporting to Soli-Bond, then no reasonable jury could conclude that Soli-Bond knew or expected Emery would be exposed to high levels of toxic gases on March 22 based on four separate H2S alarms occurring during the previous three months. In this regard, the evidence in this case does not even rise to the level of that present in *Lantz*, where the plaintiff asked his supervisor to evacuate twice on the same day of a known chemical spill before he finally became sick and passed out.[74]

---

[74] *Lantz*, 775 P.2d at 938.

13

Soli-Bond's failure to implement Chevron's supplied-air directive was likely negligent, and potentially reckless. However, it does not demonstrate that Soli-Bond knew or expected Emery would be exposed to H2S or other toxic gases while performing filtering operations on March 22. "Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, willfully failing to provide a safe place to work, or even willfully and unlawfully violating a safety statute, this still falls short of the kind of actual intention to injure that robs the injury of accidental nature."[75]

Finally, even assuming Soli-Bond failed to provide Emery with adequate medical treatment or information concerning exposure to H2S, the Court does not see how this could establish intent to injure. Soli-Bond's post-injury actions and omissions in failing to seek proper medical attention for Emery are not probative of whether Soli-Bond knew or expected Emery would be exposed to toxic gases while conducting filtering operations at Chevron's Refinery on March 22, 2008.

Plaintiff's allegations do not establish an immediate and direct link between the employer's actions and a known or expected injurious consequence. That immediate and direct link allowed the *Help* court to apply the intentional injury exception beyond the "indisputably intentional" acts that previously defined the exception.[76] No reasonable jury could conclude, based on the evidence in the summary judgment record, that Soli-Bond knew or expected Emery would be exposed to toxic gases while performing filtering services on March 22, 2008.

---

[75] *Lantz*, 775 P.2d at 940 (quoting 2A A. Larson, *The Law of Workmen's Compensation* § 68.13, at 13-36–13-44 (1988)).

[76] *Helf*, 203 P.3d at 971 (citing *Bryan v. Utah Int'l*, 533 P.2d 892 (Utah 1975) (battery), and *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055 (Utah 1991) (defamation) as examples of "indisputably intentional, rather than negligent, acts").

Emery's claims therefore fall outside the scope of the intentional injury exception and are barred by the Utah Worker's Compensation Act.

## ORDER

For the reasons set forth above,

IT IS HEREBY ORDERED that Soli-Bond's Motion for Summary Judgment (docket no. 65) is GRANTED and summary judgment is entered in favor of Soli-Bond on all of Plaintiffs' claims.

IT IS FURTHER ORDERED that Soli-Bond's Motion to Strike the Deposition of Troy Graf (docket no. 75) is DENIED AS MOOT.

Dated May 25, 2012.

BY THE COURT:

_____
David Nuffer
United States District Judge